Good morning. We'd appreciate each appellant indicating how much time she or he would like for rebuttal. Would the clerk call the first case, please? Case number 15-1725, Nigel Wright v. S Burt, Oral Harm did not fit the 15 minutes for 5. Ms. Corbacus, please may I have the floor? Good morning, Your Honors. May it please the Court? Raina Corbacus from the Michigan Attorney General's Office on behalf of Respondent Appellant Burt. I have reserved 3 minutes for rebuttal. Fine. This is a case where the District Court granted habeas relief to Petitioner Nigel Wright for his role in the murder of 21-year-old Travis Goodwin. The State asks this Court to reverse that grant for the simple reason that the District Court failed to apply ADPA deference when it evaluated the State Court's merits rulings. Rather than look at the State Court's rulings deferentially, the District Court disregarded the State's fact findings and went on to make its own findings regarding the credibility of a witness based on a very selective view of the record while ignoring some evidence and giving improper weight to other evidence. While the District Court acknowledged ADPA, it went on to pay lip service to it, and its opinion reads much more like de novo review. As this Court knows, review under ADPA is extremely limited and State Court decisions must be given a high measure of deference. A federal court on habeas can only review or overturn a State Court's decision when there's no reasonable dispute that the State Court was wrong. And that's what the Supreme Court recently said in the Woods case. Did the State Court decide the issue of whether the performance of the attorney was deficient? The State Court simply said, even assuming he could show deficiency, there was no prejudice. Okay, so we should not give any deference on the deficiency aspect then, right? Under Rainer, this Court need not give deference to it. But the State's position is that irrespective of deficiency, Petitioner hasn't shown prejudice, and he has to show both in order to show a Strickland violation. My plan today is to focus on the merits of the State Court's ruling with respect to the improper admission of the statements made by a victim to the police officer, and talk about how the District Court erred. I do briefly note that the underlying confrontation clause is defaulted, and I'll rely on my answer for that. The State Court in this case found that the admission of the statements by the victim to the officer were not so prejudicial or harmful so as to affect the jury's verdict and warrant relief. The State Court primarily focused on the strength of the evidence against the Petitioner, and it rejected the Petitioner's claim that the main witness, there was an eyewitness in this case, the main witness's reliability was so questionable that relief was warranted. But rather than look to the adequacy of that State Court ruling and give deference to the findings that the State Court made, that the inconsistencies, or any inconsistencies, were not consequential, the District Court completely disregarded those fact findings, and it went on to explain why it found Curry, who was the main eyewitness, not credible, based on a very selective view of the evidence. I'm sorry. Please, Judge Daughtry. No, you go ahead. No. I mean, you're going to be a long day here. One of the things I didn't understand, and maybe it turns out to be irrelevant in the end, but there were these jail phone calls that I couldn't see that the State Court of Appeals took into consideration. I mean, it isn't mentioned in the opinion, am I correct? Well. What happened to those, and why didn't those, I mean, there was something about those calls that sounded incriminating, self-incriminating, if you will. Those calls were very incriminating, and the prosecutor spent a great deal of closing argument detailing how incriminating those calls were. The State Court didn't expressly mention those calls, but did talk about other evidence, and those calls were referenced in the briefing on direct appeal, and State courts are presumed to have considered the record, and they were before the record, the State Court record. They were actually before the Court of Appeals, even if the Court of Appeals didn't end up mentioning them. They were before the Court of Appeals, and they were quite damaging, and that is something that the district court in this case entirely ignored, didn't mention it at all in the opinion, and that was part of the strength of the evidence against Petitioner in this case, those damaging calls. Where are they in our record? Where are the transcripts of these calls? I'm struggling with, I mean, they're argued, they're discussed in the briefs. Have I missed them in the record before this court? I'm assuming we filed them as part of the Rule 5 material in the district court, and they were filed, but I'm not exactly sure. I mean, typically we file material as part of the Rule 5 before the district court, and I am... They should be in the district court's record. They should be in the district court's record. Were they transcripts or... They were transcripts. They were excerpts of calls, and 11 transcripts were admitted at trial, and the prosecutor, as I indicated, spent a great deal of time discussing how incriminating they were. Again, the district court made no mention of those, and that is part of the strength of the evidence against Petitioner. Well, I've struggled a little bit with them because what I find in the record, I'm not sure how strong it is problematically for this defendant because isn't what the call said not just, I'll pay you not to come, but I'll pay you to come and tell the truth? Well, that's the way trial counsels... That was his version of what they said. Well, what does the transcript say? Well, the transcripts, and if they aren't in the district court record... They are. Are they? Okay. The transcripts should be looked at, and the transcripts, they don't indicate outright... I mean, they're very suggestive that Wright wanted to pay Curry to not come to court to testify. But are they not also suggestive that what he was saying was, I will pay you either not to come or to come and tell the truth? Well, that is one inference, but I think the more reasonable inference... Well, what did they say? Okay. I had a question about inferences, is what is in the record? What are the words? The calls, there were 11 of them. They talked about getting to Curry, about, this is Petitioner talking to Curry's father, about finding him, about giving him money, about paying him, giving him $1,000. He also implicated himself as being at the scene, Wright did. He said Herm was out there too when the victim was shot. So it also shows that he admitted that he was at the scene. He says, but I didn't have a gun though, which was the prosecutor's theory all along, that he didn't have a gun, he was just the driver. I would like to get to the particular language of what was said about the payment, because the quoted material that I did find, I understood to say, I will pay him not to come, or I will pay him to come and tell the truth. Well, I think the court does need to look at the language of those calls. Do you have that language before you? I have a summary of it. I don't have the actual calls. Do you dispute that he said, I will pay him to come and tell the truth? I think that that's one inference. I don't know that it was that direct that he said that. But I think that that's an inference that the jury could have made. But I want to say that even without these calls, let's assume that the court views these calls in that way, we have an eyewitness in this case. We have an eyewitness, Dwayne Curry, who has consistently identified Petitioner as the shooter. Was Petitioner on the first conversation? He did not identify any of the suspects on the first day it happened. It was 4 in the morning. He gave a statement to the police. He described the shooting, but he did not identify names, and that's because, he said later, he was afraid for his safety. He lived in the neighborhood with his 6-year-old daughter. That night of the incident, there were people around, and understandably, he was afraid to name names. He wasn't afraid when he was called in a month later and going to be charged with his own crimes and then decided to volunteer this information? Well, he was never told he was a suspect in the murder, but I don't think it was unreasonable for him to not want to be blamed for the murder or any involvement in this. He didn't do it, but he admitted that his first statement was less than complete, and then he went on and identified the shooters and Petitioner, and after that, he consistently identified them. He identified them in the investigative subpoena. He identified them at the preliminary exam. He identified Petitioner, and he's only identified Petitioner as the driver repeatedly in this case. He's never identified anyone else. And he was subjected to a very thorough cross-examination at trial, and trial counsel tried to get him to back down about his identification, and he didn't. He said, I knew it was him. And he had known Petitioner for a number of years, most of his adult life. He knew the shooters. This wasn't a stranger identification of the getaway driver. Petitioner, he saw him. He knew the car he drove. He knew his hairstyle. He knew who Petitioner was. So he's been consistent on the most important issue, which was identity, all along. He's been very consistent on that. One of the things that I wondered about in looking at the State Court of Appeals opinion is that in several places it seems like the test that's being applied on the prejudice prong is whether there was an effect on the outcome, as opposed to a reasonable probability of an effect. Should that mean that we don't need to give the deference that you were suggesting at the beginning to the Michigan Court of Appeals opinion? No. The Court of Appeals did set forth the proper test a little bit earlier in its opinion. I think the references that you were making, too, were shorthand references to the prejudice standard, and this court has found that such shorthand references where they had previously set forth the proper standard don't mean that there was a contrary to application of Strickland. Can outcome determinative language be shorthand for reasonable probability of outcome determinative? I understand there are shorthand versions. I'm struggling with how this one qualifies for that. Well, I think the state court was reviewing the standard under state law, and that's some of the language that is used by the state courts. But several sentences before that, it accurately described the Strickland. It didn't mention Strickland, but it was the Strickland standard for prejudice, which was a reasonable probability that the outcome of the result would have been different. I think that that reference that it used later in its opinion was just, it may have been imprecise, but it had earlier set forth the proper standard. And it's important to note that the district court here didn't find and petitioner didn't argue a contrary to application of Strickland. The district court found only that there was an unreasonable application of Strickland. But when you look at the district court's opinion, it really didn't even explain that. It looked at the case more in a de novo manner. I see my time is up. Thank you. Good morning, Your Honors. I'm Bruce Benton-Martin of the Federal Defender Office in Detroit on behalf of Nigel Wright. The district court correctly determined that Mr. Wright's trial attorney rendered ineffective assistance of counsel in failing to object to what the court called an obvious confrontation clause violation, and that the state court unreasonably applied Strickland in deciding that counsel's error did not prejudice Wright's case. The state has not contested this performance and that counsel's performance was deficient. Did the state admit it was deficient or did they just say we'll assume it was deficient? That's correct, Your Honor. And I think in turn this case turns on prejudice, which under Strickland the petitioner must show a reasonable probability that the proceeding would be different without counsel's error. The respondents tried to paint the district court's analysis as making an improper de novo determination of the credibility of the state's key witness, Duane Curry. But what the Strickland analysis requires and what the district court did was an assessment of the strength of the prosecution's case absent counsel's error. In doing that, the district court here explained that the evidence implicating Mr. Wright was far from overwhelming and it rested almost entirely on the testimony of Mr. Curry. The evidence at issue here, these testimonial statements from the victim made to a police officer before his death, played a critical and unconstitutional role in establishing motive and in impermissibly bolstering Mr. Curry's testimony. The district court correctly noted that Mr. Curry's testimony suffered numerous credibility problems. He didn't identify Mr. Wright as the driver of the vehicle until nearly a month later after being arrested and believing himself to be a suspect in the murder. He was at the scene immediately after and did have a chance to tell police officers there. He explained at trial that he believed that the victim would survive, but even so, he waited until... Well, if he believed the victim would survive and was going to be capable of saying who shot him, he may have been a little reluctant to get into it at that point. And once he did identify both the driver and the shooters, he never wavered from that identification. So it's not like he was recanting any of his prior statements to the police. They just became more robust in a sense. He did not identify anyone other than Wright as the driver. That's correct. I would note, though, that he waited until two weeks after the death of Mr. Goodwin to say anything to police, and it was only after he was arrested. So it wasn't just right after the death that he came forward. Also, he had an investigative subpoena in this case where he told the prosecutor that he did have doubts that it was Wright. In fact, he only saw braided hair. Well, what about the calls from the jail then? Let's put aside the one about paying somebody to come and tell the truth and think about this is the defendant admitting that he's at the scene of the crime. I think the tapes can be read in many different ways. Can that be read in many different ways, or are the tapes an admission that he was present at the scene? I don't believe so. Mr. Wright is talking on tapes about rumors that are going on in the neighborhood. He's worried that Mr. Curry has been told by someone else to testify against him. He's asserting his innocence, in fact, in the tapes. But he's admitting that he was there. I think the thing that we need to get a grip on this morning is that the jury heard all of that and made those determinations, made credibility determinations. They must have decided what those phone calls meant if, in fact, the phone calls were in front of the jury. And there's not much we can do about all that. The jury found your client guilty. That's correct. I believe that these statements from the grave, though, from Mr. Goodwin were allowed to unfairly prejudice the case, in particular showing motive for why Mr. Wright would have been involved in this at all. And I would note that the statements were that Goodwin had received threats from Wright and that he had expressed fear from these people as to something happening to him and that these were played up in closing arguments, as that Goodwin had said that someone's going to hurt me and that dying men speak the truth and that Mr. Goodwin maybe had a sense of what was coming to him. Well, certainly somebody did hurt him. He wasn't dying then, though. He wasn't dying when Goodwin purportedly made these statements. I agree, and that was the prosecutor's characterization. It was the portion of the tape where he stopped the tape, excuse me, the closing arguments where they're talking about these statements from Goodwin to Officer Thomas. In order for you to win, do you have to show deficient performance? I believe so. So a question that comes to mind that I don't think the briefs dealt with is the question about forfeiture by wrongdoing and whether that should be an exception to the Confrontation Clause violation here. In other words, if your client procured the absence of Goodwin by killing him, he would not be able to object to raise a Confrontation Clause claim with respect to this testimony. Wouldn't that be a reason why the Defense Counsel didn't raise the Confrontation Clause claim at the trial? At that point, it hadn't been established that Mr. Wright had taken any part in killing Mr. Goodwin. Right, it was the criminal trial. So the government would not be able to object on that basis until it was established? Is that your point? Well, and also I think that these statements were made, it's actually unclear how long before the murder. It was just in the months before the murder that Goodwin made these statements to Officer Thomas. I think that's another reason it's not clear that he was murdered because of making these statements about threats in any way or because he was alerting authorities about threats being made to him. So you're saying there would have to be a causal relationship in order for the forfeiture by wrongdoing to apply? I don't think that the forfeiture by wrongdoing was raised in any way. That would be something. Well, it wasn't because the whole Confrontation Clause claim wasn't raised. Yeah, right. And the question is why did the Defense Counsel not raise the Confrontation Clause claim? And if it wasn't deficient performance to fail to raise it because it was going to be a loser of an argument, then your whole case falls apart. I don't think it would have been a loser of an argument. I think that he had no ability to cross-examine Mr. Goodwin. I do think that they— Right, because he's alleged to have killed him. Right. That's why he can't cross-examine Goodwin because he is then convicted of killing him. Sorry, but— I understand your point, Your Honor. But it certainly hasn't been developed, and I didn't see it in any of the briefs at all, the forfeiture by wrongdoing issue. That's correct, Your Honor, and if you would like a supplement on that point, I would be happy to provide something on that. Yeah, I think it would be good for—I'll ask your opponent what her thoughts are on that, but unless there's some obvious answer from her, I think both sides should brief it if the other judges don't have any objection as to what the forfeiture by wrongdoing doctrine would do to the Confrontation Clause claim. I would appreciate a chance to look more into that, Your Honor. Let's assume that this was improperly admitted evidence. Isn't the case law fairly clear that if it's merely cumulative evidence and doesn't add something that is definitively new, that there's not a problem? I would have two responses to that. One is I think that this Court has repeatedly referred to reinforcing or corroborating testimony as being something that can produce a non-harmless error and can prejudice someone's case, and I would argue that this was allowed to reinforce and corroborate Mr. Curry's testimony. And second, I do think it added something new. I don't think that there was anything clear from the other comments in the record. The Respondent has made the argument about Alice Smiley, Mr. Goodwin's mother, making a comment that Goodwin and Wright were enemies, but I do think that's a far cry from the specific threats that Officer Thomas mentioned about Goodwin receiving threats and expressing fear that something was going to happen to him. I think that that's a big difference, and it did add something new that was allowed to prejudice the jury. I'd like to note the mention of the State Court applying the wrong standard for ineffective assistance. They do mention the reasonable probability analysis, but then in writing in the analysis of the IAC claim, say that Wright had not established that the erroneous admission of Goodwin's statements was outcome determinative. I think that it's hard to argue that's just shorthand, as that Strickland actually explicitly rejected an outcome determinative approach in favor of this reasonable probability approach that the District Court in this case followed. I think that this is further support for affirming the District Court's decision. But would we be saying it was a contrary interpretation of Strickland as opposed to an unreasonable application of Strickland? It was under the first part of the prong. I think it shows both. That this was a... They're actually expressly stating a standard that's contrary to Strickland. And also I think it plays into the fact that they were unreasonably applying Strickland in looking at this set of facts. What credence do we have to give to the findings of the court below then and the determination of credibility and evaluation of the evidence by the jury? As to the State Court's decision under 2254, we have to look at whether it was an unreasonable application of Strickland to the facts as they've stated. And I think that's exactly what the District Court's analysis here did, was run through and look at all of these facts and see if this really amounted to a reasonable probability that the case would be different if these statements hadn't been allowed to be portrayed to the jury and then emphasized in the closing arguments. But isn't that a really hard thing for a federal court on habeas to say that the State Court was unreasonable in its weighing of how the jury would decide if it didn't have this information? I think that that's why the standard is only a reasonable probability. It doesn't have to be 100%. It doesn't have to be outcome determinative. That this would have been the difference for the jury. It just has to be that there's a reasonable probability that if these statements hadn't been played or hadn't been told to the jury that the case would be different. I'd note that it actually bookended the closing arguments in this case. The prosecutor listed it as one of the first things in starting the closing arguments and as one of the last things at the end of the closing arguments. I think that also adds that there's a reasonable probability that if these hadn't been emphasized so heavily. And I'd note that that's one of the things, again, that this court has noted in its other decisions applying these standards, that if something is emphasized in closing argument that it can make it harmless, non-harmless error. Is there an analogous case at the Supreme Court, from the Supreme Court, where the Supreme Court has upheld the grant of habeas or has, in fact, granted habeas in a Strickland unreasonable application prong situation? The cases cited in our brief are not. There's not a case that is so closely tied to these facts. And the respondent has pointed that out in their brief, that there's many circuit decisions cited in our brief. But I would note that all of those decisions are interpreting Supreme Court law regarding ineffective assistance of counsel in Strickland and the harmless error standard from Brecht and Van Arsdale and that under Marshall v. Rogers, this court is entitled to look to Circuit President in determining the proper application of Supreme Court precedent. And I would ask this court to affirm the district court's decision. Thank you. Just a few points, Your Honors. Petitioner mentions that the case turns on Strickland prejudice. Strickland is the relevant Supreme Court law, but there's another part to the inquiry, and that's whether the state court unreasonably applied Strickland. That's the question on habeas. And this court recognized that very important distinction between de novo review and between review under AEDPA in the Daniels decision, which I did cite in my brief. And I think that case is really important because it's much like this one where this same district court judge granted habeas relief on that one involved in an ineffective assistance claim, finding prejudice. But this court reversed the district court, finding that the district court failed to accord the state court the proper deference. And I think that case is very much like this one. And this court also noted that the evidence in that case was weak in several respects, but yet found that under AEDPA it couldn't find that the state court's ruling was unreasonable. Opposing counsel mentions the investigative subpoena, and there was doubt at the investigative subpoena. I think it's important for the court to look at the investigative subpoena as a whole. And I think it's reasonable to view any doubt that Curry, the eyewitness, expressed as more of a confusion about a question than hedging about the identity of the shooter. And at least three times in that investigative subpoena he identifies Petitioner as the shooter, and he does that consistently after that, and especially at trial too. Many of the district court's concerns about Curry's credibility were before the jury who chose to credit Curry's identification of Petitioner as the shooter. But the jury did that with this questionable evidence. So the jury could have been influenced very much by this evidence. The evidence that was improperly admitted was marginal evidence. I think the district court completely overstated any value of the challenge statements. The statements were vague. They lacked detail. There weren't any concrete threats that were told to the prosecutor. And the victim also had named others in the statements that he made to the police officer, not just Petitioner. That may have helped Petitioner in this case, that there were others named. The statements were certainly not... The others that were named were not the two guys who killed the victim? One of them. One of them. He did name one of them, but there were two others that were different altogether. And it certainly was not central to the prosecution's case, and it was a very small part of the prosecution's closing. I counted two and a half, three pages of a 55-page closing. If my math is correct, that was 5%, roughly 5%. The prosecutor spent much more time talking about Curry's identification, how consistent it was. Let me ask you this. There was something about... Was it Curry burning down the drug house? Curry was involved in the burning and admitted to the police at some point that he had. Yes. Did that have anything to do with the statement that Godwin made to the police? No. Curry testified that Petitioner had set in motion a few weeks before the burning of a nearby drug house and knowing that he was going to blame the victim for it. That was a very damaging testimony that the jury heard, which shows that Petitioner had some kind of hatred for this victim. The jury heard that testimony, and that was far more damaging than some general statements that the victim made to the police officer about having some beef with Petitioner and several others, statements which the police officer didn't even put in a report, didn't investigate. The other evidence against Petitioner was far more damaging than these statements. Did you have any reaction to the forfeiture by wrongdoing issue? That may have affected whether or not counsel was deficient, and I'd be happy to brief that. The state's position, though, is that regardless of deficiency, he absolutely cannot show prejudice in any event. So I think if you both would send letter briefs, not to exceed 10 pages, on the impact of that doctrine and have them in two weeks from today, that would be most helpful. Thank you. I will, Your Honor. Thank you. Thank you both for your argument. The case will be submitted. Would the clerk call the next case, please?